IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

RICARDO GARCIA, §
§
*Plaintiff,* §
§
V. §
§    NO. 4:18-cv-4256
INTERNATIONAL CONSTRUCTION §
EQUIPMENT, INC. §
§
*Defendant.* §
§

---

**RESPONSE IN OPPOSITION TO ICE'S MOTION FOR SUMMARY JUDGMENT;
OPPOSED MOTION FOR CONTINUANCE OF THE DEADLINE TO RESPOND TO
ICE'S MOTION FOR SUMMARY JUDGMENT;  OPPOSED MOTION TO COMPEL**

---

TO THE HONORABLE LYNN NETTLETON HUGHES:

COMES NOW, RICK GARCIA, thereafter "Rick" files this response in opposition to ICE's motion for summary judgment and attaches a declaration (attached as Exhibit 10), as required under FRCP 56(d), to deny ICE's motion, grant a continuance of the deadline for Rick is respond to ICE's summary judgment motion and allow Rick's time to take discovery, and/or order ICE to be compelled to produce five witnesses identified in a April 16, 2019 interrogatory response and to depose a corporate representative about topics as identified in Exhibit 10.  Rick respectfully shows the Court the following:

# I.
# EXHIBITS

Rick attaches the following summary judgment evidence in support of this response:

1.  Declaration of Dr. Gerard Gabel, MD;

2.  Declaration of Business Records Custodian for Dr. Gerard Gabel, MD [containing bates labeled medical records 82 – 114 produced to ICE on March 19, 2019];

3.  Deposition of Rick Garcia, taken on March 28, 2019.

4.  November 14, 2017 EEOC Position Statement [produced to Rick on March 3, 2019 and bates labeled ICE/GARCIA 000116 – 117];

5.  Excerpts of ICE employee handbook [produced to Rick on March 3, 2019 and bates labeled ICE/GARICA 000095 ("Disciplinary Procedures") and ICE/GARCIA 000089 – 90 ("Code of Conduct")];

6.  ICE's March 5, 2019 "response to order for disclosure"

7.  ICE's March 15, 2019 "response pursuant to the Court's March 3 Order"

8.  ICE's April 16, 2019 "objections and answers to Plaintiff's first set of interrogatories"

9.  Rick's October 19, 2017 EEOC Complaint [produced to Rick on March 5, 2019 and bates labeled ICE/GARCIA 000027 – 28].

10. Affidavit of R. Scott Poerschke, as required under FRCP 56(d).

11. Business Organizations Inquiry, International Construction Equipment, Inc.


# II.
# PROCEDURAL SUMMARY

On January 9, 2019, the parties filed a "joint discovery/case management plan under rule 26(f)" (thereafter referred to as "JD/CMP"). (Doc # 8, filed on 1/9/2019.)   The January 9, 2019 JDCMP was filed pursuant to the parties' representations and, eventually, agreements made at a telephone conference occurring on January 4, 2019.  Scott Poerschke, attorney for the Rick, and Mehronissa Modgil, attorney for ICE, participated in the January 4, 2019 telephone conference.

At the conclusion of the January 4, 2019 conference, the parties entered into various agreements regarding discovery and the deadlines that needed to be set in the case in light of the scope of this lawsuit, which is not great or substantial.  (Id.) The agreements and/or representations were as follows:[1]

1. The parties requested a discovery deadline of October 2019.  (Id. at 2.)[2]

2. The parties indicated that discovery otherwise should proceed as provided under the Federal Rules of Civil Procedure and the Local Rules for the Southern District of Texas.[3]

3. The parties indicated that the subjects on which discovery will be needed included Rick's employment with ICE, including (1) job duties, (2) compensation, (3) job performance, (4) the reasons for all employment decisions made with respect to Rick (broadly stated and agreed),[4] (5) Rick's subsequent efforts to find alternative employment, and (6) other information related to Rick's claims and ICE's defenses.  (Id. at 2 and 3.)

4. The parties indicated that ESI would be exchanged and Rick represented to ICE that such ESI would include communications related to Rick's termination between Rick's managers and supervisors.  Rick also listed other forms of ESI, including (1) Rick's personnel file, (2) performance evaluations, (3) formal discipline, (4) Rick's revenue results from 2013 through 2016, (5) revenue results from other employees in the same position as Rick, (6) sales expectations set for all salesmen employed by ICE from 2013 through 2016, and (7) other documents relied upon by the ICE to make the employment decisions at issue in this lawsuit, including Rick's termination.  (Id. at 3.)

---

[1] For any representation made by Rick as to the discovery that he would conduct in this case, as reflected on the JD/CMP, ICE did not list any objection to same.  Ordinarily, if ICE did have an objection to the discovery requested, then ordinarily such objection would be listed on the JD/CMP as to better narrow and focus the issue at the FRCP 26(f) conference.

[2] The Court has issued a docket control order which would set the deadline for the parties to conduct discovery.  As the Court has now set a deadline for ICE to file an MSJ and for Rick to respond (and in the process denied various requests for Rick to conduct discovery), Rick construes this request to have been denied and requests clarification from the Court regarding this issue.  In the event that Rick's interpretation is correct, Rick requests reconsideration of this denial and moves for a continuance of the deadline for Rick to respond to ICE's MSJ on this basis.

[3] The Court has also appeared, in light of the Court's actions after filing the JD/CMP to have denied this request as well.  Rick requests clarification from the Court on this issue.  In the event that Rick's interpretation is correct, Rick requests reconsideration of this denial and moves for a continuance of the deadline for Rick to respond to the ICE's MSJ on this basis as well.

[4] This would include Rick's termination as well as the 2.5 M quota that Rick was placed in the beginning of January 1, 2016.

5. Rick indicated that he indicated to issue an initial request for production in accordance with Judge Rosenthal's "order for certain employment case," which includes the part 3(2) – "documents that the defendant must produce to plaintiff." An exhibit containing Judge Rosenthal's order was attached to the JD/CMP as Exhibit 1.

6. Rick indicated that he indicated to send interrogatories to the plaintiff within the next 30 days. The categories of the types of interrogatories were reflected on the JD/CMP on page 3. (Doc # 8, at 3.)

7. Rick indicated that he intended to take the depositions of various categories of individuals). (Doc # 8 , at 3 and 4.)

8. The parties agreed to consider mediation after the substantial completion of the discovery. (Doc # 8, at 5.)

On February 1, 2019, the Court entered an "order for disclosure." (Doc #10, filed 2/01/2019). By March 1, 2019, ICE was ordered to furnish Rick items A – K.

On March 5, 2019, ICE responded to the February 1, 2019 "order for disclosure" and produced some documents and information, but otherwise, indicated for items B, C, E, H, I, and K that further documents or information would be supplemented.

On March 7, 2019, the Court entered a "management order." (Doc # 13, filed 3/7/2019). The order set certain deadlines for the parties to complete various aspects of discovery. Of particular reference to this motion, the Court ordered ICE to get the "data" on the five lowest sales performers between 2014 and 2017.

On March 15, 2019, pursuant to the Court's March 7, 2019 "management order," ICE produced a chart containing the total average sales of the five lowest sales performers. The chart did not contain information indicating sales for each of the five lowest employees. See Exhibit 7.

On April 5, 2019, and in accordance with the prior March 7, 2019 "management order," the parties filed a joint report on the status of the case. (Doc # 15). In the joint report, ICE indicated, in a reversal of prior representation as contained in the JD/CMP, that ICE would move for summary judgment before completion of the requested discovery deadline previously requested

in the "JD/CMP."[5]   Rick indicated that he would depose an ICE corporate representative, in accordance with FRCP 30(b)(6), within the next three weeks.   Without given any reason, ICE indicated that they opposed the taking of the deposition.

On April 9, 2019, the Court indicated that "Ricardo Garica may not depose a corporate representative from [ICE]" without explanation.   (Doc # 16, filed April 9, 2019).   The order was issued prior to the production of the deposition topics to ICE.   The requested deposition topics are attached to this motion as Exhibit 10 and have been amended to address any additional topics that have arisen, especially in light of the interrogatory responses received from ICE on April 16, 2019, the production responses received from ICE on April 11, 2019 (which contained only objections), and the claims raised in ICE's MSJ.   Rick requests reconsideration of this denial and moves for a continuance of the deadline for Rick to respond to ICE's MSJ on this basis.

On April 16, 2019, Rick received unsworn[6] responses to his interrogatory request. See Exhibit 8.   In response to interrogatory no. 2, ICE listed five individuals[7] (excluding Rick) of each individual likely to have discoverable information relevant to the claims or defenses asserted in this case. ICE also indicated the subject of each request and listed Christian Cunningham and Kevin Kane as witnesses who both had knowledge of Rick's termination.    ICE did not produce the individual contact information for each of these five witnesses and indicated that the only basis to contact them was indirectly through William Stukenberg and Mehronissa Modgil, as attorneys for ICE.

---

[5] As indicated above, the parties previously requested a discovery deadline of October 2019.   Although the parties did not specify a deadline to file dispositive motions in the JD/CMP, Rick certainly believed that setting a discovery deadline of October 2019 indicated that the dispositive motions deadline would be set after the close of discovery on October 2019.

[6] On May 9, 2019, in preparing for this MSJ response, Rick noticed that the April 16, 2019 interrogatory responses did not contain the required "oath" under FRCP 33.   On that same day, Rick promptly notified ICE of the deficiency.   As of the date of filing of this motion, ICE has not responded.

[7] These witness are:  Christian Cunningham, Kevin Kane, Omar Pareja, Brad Sullivan, or Henry Roberts.

On April 18, 2019, Rick emailed and mailed via certified mail/return receipt requested[8] "plaintiffs' notice of oral deposition of witnesses identified in response to plaintiff's interrogatory no. 2." The notice requested the deposition of the five witnesses identified in ICE's interrogatories received by Rick on April 16, 2019, as discussed in the immediately preceding paragraph.  See Exhibit 11.

On April 26, 2019, ICE filed a "motion to quash plaintiff's deposition notice." (Doc # 18, filed 4/26/2019.) ICE listed three reasons to quash the requested discovery:

1. First, ICE indicated that, essentially, they did not have enough time within the two weeks to prepare. (Id., at 2.)[9]   Rick is not opposed to continuing the deposition, but in light of May 10, 2019 deadline for Rick to respond to ICE's motion for summary judgment, the discovery needed to be completed prior to that May 10, 2019, absent the Court granting Rick's request for a continuance of the deadline for Rick to respond to ICE's MSJ which is now hereby requested on this basis.

2. Second, ICE indicated that Rick did not disclose in the April 9, 2019 "management order" his intention to depose the requested individuals.   This is correct.  The identification of the requested individuals with knowledge of this case was not made by ICE until receipt of the interrogatories, especially interrogatory no. 2, until April 16, 2019.

3. Third, ICE indicated that the depositions should be quashed because they are unnecessary "at this time."   ICE indicated that Rick should already know the basis for his discrimination.   Although Rick most certainly knows the basis for his alleged discrimination, unfortunately, established precedent of this Circuit does not allow Rick to

---

[8] A copy of the "green card" is attached to the notice.

[9] Prior to filing ICE's "motion to quash" on April 26, 2019, Rick did not receive any communication from ICE proposing an alternative date so the deposition could take place prior to the deadline set by the Court for Rick to respond to the ICE's MSJ – May 10, 2019.

carry his burden as the non-movant, in a traditional summary judgment context, based only upon his testimony alone.  Precedent from this circuit indicates that Rick is a biased witness and his testimony must be corroborated.  Additionally, well established precedent from the Fifth Circuit indicates that the employer's own speculation about the reasons for his firing, standing alone, are not sufficient.[10]

On April 29, 2019, the Court issued and "order quashing depositions" before the timeframe for Rick to respond to ICE's motion.  (Doc # 19).    Without explanation, the Court indicated that "Ricardo Garcia may not depose Christian Cunningham, Kevin Kane, Omar Pareja, Brad Sullivan, or Henry Roberts."  (Id.)  Rick request reconsideration of this denial, in light of ICE's admission that each of these individuals contain knowledge of discoverable information. Rick also requests clarification that the order issued on April 29, 2019 (Doc # 19) does, in fact, grant ICE's motion to quash the above referenced witnesses as the order lacks any real "order" language indicating that Garcia is ordered not to depose the above listed individuals. (Id.)

## III.
## FACTS RELATED TO THE CASE

Rick highlights the additional relevant facts as testified during his deposition:

## 1.  RICK'S 2.5 MILLION QUOTA AND THE LOSS OF HIS TWO LARGEST CLIENTS

Rick never received an update from anyone at ICE about Rick's declining sales numbers, or indication that ICE was dissatisfied with Rick's sales numbers. (Ex. 3, p. 256, ll. 7-12).  Rick never received communication from ICE that the loss of Rick's two largest clients was the cause of Rick's declining sales numbers, but Rick knew this to be the case. (Ex. 3, p.256, ll. 12-18).  Rick anticipated that it would take five years to recover from the loss of his two largest clients - Comsa

---

[10] In *Robinson v. Jackson State Univ.*, --- Fed. Appx. ---, 2017 WL 6003389 (5th Cir. 2017), the Fifth Circuit rejected the employee's "own speculation about the reasons for his firing." The Court noted that "we look to the 'real reason' for the termination, not an employee's 'subjective belief' about its impetus. Id. at *7 (citing *Bauer v. Albemarle Corp.*, 169 F.3d 962, 967 (5th Cir. 1999)).

and Tradeco. (Ex. 3, pp. 256-27, ll. 19-3).  Rick believed he could reestablish his relationship with Comsa and Tradeco in two to five years. (Ex. 3, p. 257, ll. 10-18).

When Rick's sales quota was increased from $1 million to $2.5 million, Kevin Kane explained that the $2.5 million quota would be a joint effort or a total for the Gulf Coast region, which included the sales staff for the Louisiana branch. (Ex. 3, p. 262, ll. 7-22).

## 2.  RICK'S PARTICIPATES IN THERAPY AFTER HIS INJURY

Dr. Gabel gave Rick home therapy and outpatient therapy. (Ex. 3, p. 233, ll. 3-7).  The outpatient therapy was performed in west Houston. (Ex. 3, p. 233, ll. 8-10).  The home therapy consisted of movement, rotation in the arm, stretching the arm, and working with resistance bands called TheraBands. (Ex. 3, p. 233, ll. 11-18).

At the time of Rick's injury, from August 2016 to December 27, 2016, and through the date of Rick's deposition, Rick performed the home therapy. (Ex. 3, p. 233, ll. 19-25).  While Rick was recovering from his injury, from August 2016 to December 2016, Rick devoted approximately two hours a day to home therapy. (Ex. 3, p. 234, ll. 1-8). Rick would say that the therapy had an impact on Rick's ability to sell in the period of August 2016 to December 2016. (Ex. 3, p. 234, ll. 9-12).

During the time period of Rick's recovery, from August 2016 to December 2016, Rick was not able to devote 100% of his attention to his job. (Ex. 3, p. 234, ll. 21-25).   Rick indicated that he was working from home. (Ex. 3, p. 235, ll. 1-3).  From August 2016 to December 2016, Rick worked from home approximately 4-5 hours per day. (Ex. 3, p. 235, ll. 4-11).   Prior to his injury in August of 2016, Rick worked more than 4-5 hours per day. (Ex. 3, p. 235, ll. 15-18).   On average, Rick worked 12-14 hours a day at ICE prior to his injury. (Ex. 3, p. 235, ll. 19-22).

## 3.  RICK'S STAYS IN COMMUNCATION WITH KEVIN KANE WHILE HE IS RECOVERING

Rick can't remember specifically communicating with ICE or Kevin Kane often about his sales efforts during the time of Rick's injury. (Ex. 3, p. 236, ll. 16-20).  But, Rick was communicating

with Kevin Kane about Rick's interactions with customers during the time of Rick's injury. Rick had to communicate with Kevin Kane because Kevin Kane provided the sales numbers that Rick was to use for specific sales, or pending sales that Rick had in preparation either for a sale or for a quote for service. (Ex. 3, p. 236-37, ll. 25-8).

While Rick was recovering from his injury, from August 2016 to December 27, 2016, he communicated with Kevin Kane mostly by e-mail. (Ex. 3, p. 238, ll. 16-21).  There should be e-mail communications between Rick and Kevin Kane all during the time period of August 2016 through December 2016. (Ex. 3, p. 238, ll. 22-25).  Rick would absolutely like to take a look at those communications. (Ex. 3, p. 239, ll. 1-3).

### 4.  RICK'S SALES NUMBERS AS REFECTED ON ICE'S EXHIBITS ARE REPRESENATIVE OF WORK COMPLETED SIX OR TWELVE MONTHS PRIOR

The numbers on the chart that was Exhibit 6 (which is attached to ICE's MSJ as Exhibit A-1, A-2, and A-3) at Rick's deposition were sales numbers. They reflect not necessarily sales on the specific date, but pending sales that Rick established with customers from either the six or twelve months prior to the actual sale taking place.  (Ex. 3, p. 237-38, ll. 9-1).  Thus, the increase of sales that Rick experienced in 2016 was mostly from work done during the beginning of the year.

### 5.  RICK'S DISABILTIY IS ACCOMDATED AT SOUTHERLAND HARDWARE

At the time of the deposition, Rick currently works for Southerland hardware. (Ex. 3, p. 230, ll. 11-13).  Southerland Hardware is aware of Rick's weight-lifting limitation of 5-10 pounds. (Ex. 3, p. 230, ll. 12-16). Southerland Hardware was made aware of Rick's weight-lifting limitation by a letter indicating Rick's lifting limits from Dr. Gabel. (Ex. 3, p. 230, ll. 18-20).  Rick requested such a letter from Dr. Gabel. (Ex. 3, p. 230, ll. 20-22).  Rick gave the letter from Dr. Gabel to his employer, Southerland Hardware. (Ex. 3, p. 230, ll. 23-25).  Southerland Hardware has been able to accommodate Rick with his lifting restriction. (Ex. 3, p. 231, ll. 1-3). Southerland Hardware has accommodated Rick by having someone else lift or move objects that Rick is not able to handle. (Ex. 3, p. 231, ll. 2-9).  Rick has not had problems asking co-workers at Southerland Hardware for help. (Ex. 3, p. 231, ll. 10-12).  Rick does not feel like individuals at Southerland Hardware have has

any resistance to helping Rick out with moving certain items. (Ex. 3, p. 231, ll. 13-16). Other employees at Southerland Hardware are generally required to lift items over 5-10 pounds. (Ex. 3, p. 231, ll. 17-21).

## IV.
## RESPONSE TO VARIOUS POINTS AS ARGUED BY ICE

1. ICE alleges that "Garcia sustained an injury to his left arm, but admits that his injury did not hamper his ability to perform the essential functions of his position." (Doc # 17, page 1). The statement does not contain sufficient detail in order for Garcia to understand exactly what the ICE's claims Garcia has admitted.

   a. To the extent that Garcia admits that he could perform the essential functions of his job at or about the time that Dr. Gabel certified Garcia to be "maximum medical improvement" ("MMI") on or about late December 2016 (after Garcia had returned to work on January 1, 2017), Garcia believes that this statement is correct. (Exhibit 2.)

   b. To the extent that Garcia admits that he could perform the essential functions of his job prior to be being certified by Dr. Gabel as achieving "maximum medical improvement (MMI)" on or about late December 2016 (before Garcia had returned to work, but after his August 3, 2016 injury), a fact issue exists with regards to this issue. Dr. Gabel indicates that he placed Garcia on modified duty, which prevented the use of the left arm and did not allow Rick to drive. (Exhibit 1, at 2-3.) The restriction started around August 23, 2017 until probably about the end of November, 2017, or even until the end of December, 2017, when Dr. Gabel finally cleared Mr. Garcia to go back to work. (Id.)

2. ICE alleges that Rick "did not request any time off from work." (Doc # 17, at 5.) This is contrary to his deposition testimony where Rick testified he "did inform them that . . . I

was going to be out for a bit, I'm obviously not going to be able to go out on service calls or anything like that."  (Ex. 3, p. 84, ll. 13 – 21.)

3.  ICE alleges that Rick testified that "having an injured arm did not impact his job."  (Doc #17, at 5.)[11]  This is contrary of the facts as outlined in the previous section regarding the impact that his arm injury had on his job.

4.  ICE cited Garcia's deposition for the proposition that "Garcia continued working full-time" during his recovery period.  (Doc # 17, page 6 (under heading "G"))  None of the pages[12] cited by ICE support this contention.  In fact, as indicated by Dr. Gabel, during Rick's recovery period, Dr. Gabel indicated that the therapy was extensive, and it required focus and Dr. Gabel did not want anything at work to interfere with Rick's therapy. (Exhibit 1.)  Dr. Gabel did not allow Rick to drive for this reason and did not want anything from work to interfere with his therapy.  (Id.)  Dr. Gabel specifically advised Rick on 10/20/2016 that "the window of opportunity is now and that we are not going to get it later. So, we need to be quote focused at this time."  (Id.)  This further corroborated by Rick's testimony as discussed in the preceding section discussing therapy.  Additionally, Rick clearly testified that he was only working on a "part-time" basis or "half-days."  (Ex. 3, page 132, ll. 18 – 23.)

5.  ICE alleges that "Garcia has not produced medical records supporting this allegation" … "that he cannot lift more than ten pounds."  (Doc # 17, at 10.) This is incorrect.  Rick's medical records indicating that he cannot lift more than ten pounds were produced to ICE on March 19, 2019.  Said medical records are attached and labeled as Exhibit 2 to this response.  Additionally, Rick has attached a declaration from his treating physician – Dr. Gerard Gabel, MD.  The Dr. Gabel's declaration is attached and labeled as Exhibit 1 to

---

[11] ICE's cite to the Garcia's deposition at 101:8-18 does not support this testimony.

[12] Specially, the Defendants cited 106:18-23, 107:1[sic]-6; 114:9-11; 132:14-17; 141:13-17.

this response. In the Dr. Gabel's declaration, he indicates that "[b]ased upon by review of these records and my own knowledge interacting and treating Mr. Garcia, Mr. Garcia has a permanent impairment of his arm and elbow and must keep lifting to 'within a rage' which involved lifting no more than a 5 to 10 pounds." (Exhibit 1, at 2.)

6. ICE alleges that "Garcia alleges (for the first time during his deposition) that he cannot lift more than ten pounds." (Doc # 17, at 10.) This is incorrect. Rick's October 19, 2017 EEOC complaint states that his "disability also prevented [him] from lifting items over 5 pounds." (Exhibit 9, at ICE/GARCIA 000027 – 000028.)

7. ICE alleges that "at the time of termination, Garcia's TWC reports and medical records show that Dr. Gabel [sic.] cleared Garcia to return to work without any weight/lifting restriction." (Doc # 17, at 10.) This is incorrect. While Dr. Gabel did not place any official restrictions upon Rick in returning back to work in January 2017, Dr. Gabel believed that Rick could effectively monitor his left arm and elbow and remove himself from any situation which would call him to lift more than 5 to 10 pounds. (Exhibit 2, at 2.) Dr. Gabel's rationale for doing so is explained in the last paragraph of his declaration. (Id, at 3.)

8. ICE indicates that Garcia must prove that "Cunningham, who made the decision to terminate his employment, knew of his alleged disability at the time of termination." (Doc # 17, page 10, at heading 'ii".)   ICE alleges that Cunningham did not know of Rick's disability at the time of termination.

    a. First, Garcia has been denied of an opportunity to depose Cunningham, therefore, Garcia has not been provided an opportunity to determine exactly what Cunningham had knowledge of.

b.  Second, the focus upon Cunningham is misplaced, because Kevin Kane, who was Rick's supervisor, was informed of Rick's injury and the need for surgery.[13] Kevin Kane was also involved in the decision to take the adverse action against Garcia. (Exhibit 8, at interrogatory no. 5.)

c.  Third, in ICE's EEOC position statement, Kurt Seufert indicated that Rick "was able to perform most of his job duties shortly after surgery on his arm."  (Exhibit 4, at ICE/GARCIA 000116.)  Seufert also indicates that Rick "was never required to lift items or do repair work to fulfill the requirements of his role."  Seufert's statement indicates that ICE did have knowledge of Rick's injuries and Rick's lifting restriction, despite current arguments made by ICE in the MSJ that such information was unknown.

## V.
## PRIMA FACIE CASE OF DISABILITY

The ADA Amendments Act of 2008 (ADAAA) defines an "actual disability" as a physical or mental impairment that substantially limits a major life activity. 42 U.S.C. § 12102(1)(A). Examples of major life activities include musculoskeletal functioning, 29 C.F.R. § 1630.2(i)(1)(ii), and lifting. 42 U.S.C. § 12102(2)(A).

An inability to lift with both arms was found to be a substantial limitation in lifting even before the ADA was amended. *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11 (1st Cir. 2002). That such a limitation is "substantial" is even clearer after the passing of the ADAAA. See, e.g., 29 C.F.R. pt. 1630 app. § 1630.2(j)(4) (substantial limitation "may refer to the way an individual

---

[13] Although ICE has not produced a declaration from Kevin Kane, ICE has apparently found Garcia to be credible enough to adopt many aspects of this testimony in support of the ICE's MSJ.  This fact, as testified to by Garcia, has been adopted by ICE.

performs a major life activity," so for example, performing tasks one-handed "will likely be more cumbersome than the way that someone with two hands would perform the same tasks").[14]

In the instant case, the evidence shows that Dr. Gabel, Rick's treating physician, regarded Rick has having a permanent impairment. Dr. Gabel indicated on 9/28/2017 that the "loads on the left arm because of the injury do need to be kept within a rage." (Exhibit 1.)  Dr. Gabel also indicated on 9/28/2017 that Mr. Garcia's "arm is not 'normal' so the precautions he was maintaining are relevant." (Id.)  On 7/20/2018, Dr. Gabel advised Mr. Garcia to "be careful." (Id.)  Dr. Gabel indicated that Rick "understands that it is permanent."  (Id.) Based upon Dr. Gabel's review of the medical records (Exhibit 2.) and his knowledge interacting and treating Rick, Dr. Gabel concluded that Rick has a permanent impairment of his arm and elbow and must keep lifting to "within a rage" which involved lifting no more than a 5 to 10 pounds.  (Id.)

In addition, Rick's condition must be assessed "without regard to the ameliorative effects of mitigating measures." 42 U.S.C. § 12102(4)(E)(i). Those measures include medication and surgery to add a metal rod.  (Exhibits 1 and 2.) They also include "adaptive strategies" that might allow an individual to avoid activities, 29 C.F.R. Part 1630 App., § 1630.2(j)(1)(vi).  Id. So Rick's condition must be assessed as he would have been if he took no pain medication and could not avoid using his arm.

An individual is "regarded as" having a disability if the individual is subjected to a prohibited act based on an actual or perceived physical impairment, whether or not the impairment limits or is perceived to limit a major life activity. 42 U.S.C. § 12102(3)(A); 29 C.F.R. § 1630.2(g)(1)(iii). A physical impairment includes any physiological disorder or condition affecting the musculoskeletal system. 29 C.F.R. § 1630.2(h). The term "impairment," like other parts of the disability definition, must be broadly construed. 42 U.S.C. § 12102(4)(A); *Equal Employment*

---

[14] Furthermore, an inability to lift need not be permanent to qualify as an actual disability. *Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 329–30 (4th Cir. 2014) (ADA amendments rejected the view that a condition had to be permanent or long-term). As the EEOC has explained, there is no requirement that an impairment last a particular length of time to be considered substantially limiting. Questions and Answers on the Final Rule Implementing the ADA Amendments Act of 2008, Question 10. A limitation can last less than six months and still be substantial. 29 C.F.R. § 1630.2(j)(1)(ix).

*Opportunity Comm'n v. BNSF Ry. Co.*, 902 F.3d 916, 923 (9th Cir. 2018). The term "impairment" also includes injuries, such as broken bones. *Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 332–33 (4th Cir. 2014). Rick had an impairment, both real and perceived, and he suffered an adverse action when he was terminated because of it. 29 C.F.R. § 1630.2(l)(1).

## VI.
## ACCOMDATION

Cunningham, in his April 22, 2016, declaration further indicates that "Mr. Garcia did not request an accommodation for his arm injury."  (Cunn. Decl. ¶ 15). The basis of Cunningham's knowledge of this statement is not supported or described in his affidavit and Rick hereby objects to the conclusory nature of this statement.  In fact, Cunningham admits that he "did not interact with Mr. Garcia on a regular basis." (Cunn. Decl. ¶ 8). Garcia's supervisor was Kevin Kane, not Cunningham.  (Cunn. Decl. ¶ 15).

Furthermore, ICE's November 14 ,2017 EEOC position statement further indicates that ICE had complete knowledge of the fact that ICE did provide accommodations to Rick. This fact is acknowledged by Kurt Seufert, in the November 14, 2017 EEOC position statement, whereby he indicated that Rick "was able to perform most of his job duties shortly after surgery on his arm."[15] (Exhibit 4, at ICE/GARICA 000116.)  Further discovery would need to be conducted to understand exactly that the term "most" refers to in the November 14, 2017 EEOC position statement, as could easily be accomplished by a deposition of the corporate representative.

Cunningham does indicate that "sales managers are expected to travel to interact with clients and potential clients." (Cunn. Decl. ¶ 6). However, Dr. Gabel specially imposed a restriction upon Garcia which prevented him from traveling.  (Exhibit 1.)   Based upon Rick's communication with Kane all during the time period that he was recovering, ICE was aware of the need to work from home and did accommodate his request.

---

[15] This statement also contradicts Cunningham's generally lack of knowledge regarding Rick's injury.

# VII.
## ICE'S ALLEGED LEGTIMATE REASON

ICE claims that Cunningham terminated Rick based on his 2016 performance.[16]  Oddly, Rick's sales performance for 2014 or 2015 does not appear to have factored into ICE's decision to terminate Rick.  ICE has failed to meet their burden of production with respect to ICE's legitimate reason, because ICE has failed to produce any evidence indicating that they have terminated any other sales manager or, otherwise, shown that the quota policy is routinely enforced.   This fact is further supported by ICE's employee handbook, which lists various grounds of prohibited conduct, but does not include poor performance as a ground.  (Exhibit 5, at ICE/GARCIA 000089 – 90.)  Interestingly, as applied directly to Rick's situation, the evidence shows that Rick's alleged poor performance in 2014 and 2015 did not factor into Cunningham's decision to terminate him.[17]  Only after Rick suffered a permanent disability in August, 2016 was Rick's poor performance suddenly an issue.   This argument is also applicable under the pretext analysis as well.

# VIII.
## PRETEXT
### (for prima facie and ultimate burden)

Without waiving the above argument regarding discovery, Rick is able to raise a few fact issues after reviewing the limited discovery produced by ICE in this case thus far.

---

[16] The reliance upon 2016 sales numbers is further indicated in the tile of section H of ICE's MSJ which states:  "Upon reviewing Garcia's 2016 performance, Cunningham makes the decision to terminate, due to his inadequate performance."  With the exception of 2016, the section also does not reference any other year's sales numbers. Cunningham also indicates in his April 22, 2016 declaration that his "decision to terminate Mr. Garica's employment was made solely on his inadequate performance as a sales manager, based primarily on his abysmally low performance in 2016." (Cunn. Decl. ¶ 16).  This is contrasted with ICE's EEOC position statement whom Kurt Seufert indicates that "[i]n 2014 results started to turn in a negative direction."  (Exhibit [ICE/GARICA 000116]

[17] As discussed in more detail below, Cunningham also admits, in his April 22, 2016 declaration, that Rick's received only a verbal warning in 2016. (Cunn. Decl. ¶ 10).

Regarding Rick's knee surgery in 2014, which is discussed on page 4 of the MSJ, ICE is correct that Rick did not suffer an adverse employment action after he recovered from the surgery. While ICE claims that the situation is "identical," there is no evidence, in contrast with Rick's August 3, 2016 injury, indicating that Rick's knee injury substantially limited a major life activity. *See Weems v. Dallas Indep. Sch. Dist.*, 260 F.Supp.3d 719, 731 n.5 (N.D. Tex. 2017) (concluding that knee surgery was not a disability under ADA).   In fact, the sharp contrast between ICE's actions following the 2014 knee surgery (which was not a disability) and Rick's August 3, 2016 injury (which was a disability) actually supports Rick's contention that he was terminated on account of his disability.   Only after Rick was disabled, did Rick suffer an adverse employment action.

On March 5, 2019, ICE produced a copy of the employee handbook.  The employee handbook indicates that ICE "believes in processive discipline as a means for correcting known rule violations, deficiencies, and poor work performance."  (Exhibit 5, at ICE/GARCIA 000095.) ICE provides a four-part procedure in which the immediate supervisor first counsels the employee, followed by a verbal warning by the immediate supervisor. (Id.)   In the event the verbal warning is not instructive, management may then impose a written warning, followed by suspension or termination.  (Id.)

Although ICE indicates that Ricks' sales "fell off a cliff" in 2016, this is contradicted by ICE's EEOC position statement which indicates that Rick's sales actually started to decline in 2014.  In the EEOC position statement, ICE indicates that "in 2014, results stated to turn in a negative direction."  (Exhibit 4, at ICE/GARCIA 000116.)   ICE has not provided any evidence indicating that Rick was ever counseled or given a written reprimand in 2014 or 2015.[18]

---

[18] ICE was ordered by the Court on February 1, 2019 to produce a copy of Garcia's employment file.  (Doc # 10, request "A").  The file produced, which ICE has indicated is produced as bates numbered documents 00001 to 000121, did not contain any written reprimand or other documentation of any performance deficiencies.

Furthermore, ICE indicated that "Cunningham warned Garcia that if his sales did not improve, he could be subject to disciplinary action, up to termination." (Doc # 17, at 4, refers to Cunn. Decl. ¶ 10.) Further review of Cunningham's declaration indicates that Cunningham warned Rick that he needed to improve his performance for 2016. (Cunn. Decl. ¶ 10). Although Cunningham did not indicate in his declaration exactly when he warned Rick of the need to "improve" his performance, a reasonable deduction can be made (in the absence of actually deposing Cunningham) that Cunningham would have done so sometime at the beginning of 2016.[19] Rick disputes the fact that Cunningham ever gave him a verbal warning. What is odd about this 2016 verbal warning is the fact that Cunningham was the person who actually gave the warning to Rick. Cunningham is not Rick's supervisor; Kevin Kane is.[20] The oddity of this fact is further highlighted by the fact that ICE's progressive discipline policy indicates that the second step involves a "verbal warning by immediate supervisor." Here, the alleged verbal warning was not given by Rick's immediate supervisor, but by the chief executive officer.

Overall, ICE has failed to follow its own progressive discipline policy in a number of respects. First, ICE has not produced any evidence indicating that Kane, Rick's supervisor, ever gave Rick any warning regarding his low sales. Second, no warning, from any member of the management, from Cunningham or Kane, was ever given to Rick in 2014 and 2015 when ICE noticed that Rick's sales started to decline in 2014 (contradicting ICE's own argument contained in ICE's MSJ). Third, no written reprimand or warning was ever given to Rick prior to terminating him. ICE has thus failed to follow its progressive discipline policy, which indicates that the policy is to be generally followed and is used to handle "many infractions," including "poor work performance." See *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 354 n. 29 (5th Cir.2005) (noting that even the non-mandatory nature of a progressive discipline plan did "not eliminate the inference of pretext raised by [the] failure to follow an internal company policy specifically stating that it should be `followed in most circumstances'"); cf. *Feist v. Louisiana, Dep't of Justice, Office*

---

[19] Cunningham confirmed that he would meet with Rick at the beginning of the year to discuss the upcoming year's performance expectations and target quota. (Cunn. Decl. ¶ 8).

[20] Again, ICE has not produced an affidavit from Kevin Kane. Rick requests to depose him.

*of the Atty. Gen.*, 730 F.3d 450, 454-55 (5th Cir.2013) (noting that relevant evidence for establishing prima facie retaliation case "may include ... an employer's departure from typical policies and procedures")

Additionally, the Cunningham's declaration does not provide any detail on exactly what the term "improve" actually means. (Cunn. Decl. ¶ 10).   The sales data produced by ICE generally shows that Rick did continue to improve his sales throughout 2016, even while he is prohibited from working full-time and driving to customers all during his recovery period. Therefore, if one were to accept Cunningham's statement as accurate, that he did instruct Rick to "improve" his sales (as in that was the actual word that Cunningham claims that he used) then Rick certainly complied with that request because his sales did "improve" in 2016.  No explanation has been given by ICE as to why they would terminate Rick when he did appear to comply with Cunningham's verbal warning, assuming that Cunningham did, in fact, give the warning to Rick. Obviously, if Cunningham were actually allowed to be deposed, Rick may discover exactly what Cunningham claims to have told Rick, as Rick is unable to verify that this verbal warning, which appears to be contrary to ICE's own progressive discipline policy,[21] ever occurred.

Additionally, even if Cunningham had given Rick a verbal warning, it would be interesting to discover exactly how many verbal warnings have been given out to other employees that faced similar quota violations.  Assuming that the term "similar"[22] means that other sales managers had quotas of around 2.5 M for 2016, the chart produced by ICE on March 15, 2019 also indicates that every other employee listed on the chart, including Omar Pareja, Chaz Rayisk, Kevin Thomas, and Reggue Randolph, may have failed to meet quotas of 2.5 M for 2016.  The chart provided by ICE only indicates averages for 2014-2017, so each employee identified may have failed to sell 2.5 M for 2016. The traditional rules of summary judgment require that all reasonable inferences to be drawn in Rick's favor, and certainly the chart produced by ICE does not conclusively negate this

---

[21] Verbal warnings are given by supervisors, which would be Kevin Kane.   This is logical.

[22] Recall that Cunningham indicated that "all other sales managers received a similar sales quota for 2016."  (Cunn. Decl. ¶ 12).

contention.  Further discovery would need to be conducted in order for Rick to obtain the actual sales data that ICE relied upon to compile this chart.

Additionally, Rick believes that Omar Pareja was hired as his replacement. (Ex. 3, page 208, ll. 14 – 15.)  What is interesting about Mr. Pareja, assuming that he was Rick's replacement, is the fact that ICE disclosed on the March 15, 2019 chart that Mr. Pareja's sales were similar to Rick's sales.  ICE indicates that "during this time, Mr. Pareja was assigned to sell equipment in a new market, and thus, expectations were lower."  (Exhibit 7)   Discovery needs to be conducted on the meaning of the term "new" in this statement: does the term "new" refer to that fact that Pareja was hired to replace Rick, and thus the market was "new" to him?    Regardless, the fact that Pareja's sales were similar to Rick's does undercut ICE's legitimate reason for terminating Rick for low sales.  If ICE terminated Rick for low sales, but Rick's replacement was only able to obtain sales similar to Rick's, was ICE really motivated to terminate Rick in order to replace him with someone that could meet a sales quota of 2.5 M?  Discovery would need to be conducted in order to get the actual sales data on Pareja's sales throughout the entire period of employment which could be accomplished quite easily through a corporate representative deposition as requested on April 5, 2019 (Doc # 15), but denied by the Court on April 9, 2019 (Doc # 16)

Additionally, Cunningham specially indicates that, as a basis for his termination, that Rick "generated an all-time low of $8,831 in December 2016." (Cunn. Decl. ¶ 13).  Cunningham failed to credit Rick for the time spent on his recovery, and, in fact, terminated him for sales numbers while he was recovering.  *See* 42 U.S.C. §12112(b)(5)(B); 29 C.F.R. Pt. 1630 App, §1630.9(b) ("In other words, an individual's need for an accommodation cannot enter into the employer's or other covered entity's decision regarding hiring, discharge, promotion, or other similar employment decisions, unless the accommodation would impose an undue hardship on the employer. See House Labor Report at 70."); Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, Question 19, Ex. A, http://www.eeoc.gov/policy/docs/accommodation.html (employer violates law by giving employee poor performance review based on disability-related absences); The Americans with Disabilities Act: Applying Performance and Conduct Standards to Employees with Disabilities,

Ex. 11 (EEOC), http://www.eeoc.gov/facts/performance-conduct.html (temporary postponement of PIP to process accommodation request ensures that employee will have equal opportunity to improve performance); Reasonable Accommodations for Attorneys with Disabilities, Example 12 (EEOC May 23, 2006), http://www.eeoc.gov/facts/accommodations-attorneys.html (employer should not give poor performance review based on disability-related absences); Questions and Answers: Promoting Employment of Individuals with Disabilities in the Federal Workforce, §VII(33) (Sep. 30, 2008), http://eeoc.gov/federal/qanda-employment-with-disabilities.html (similar); Johansson v. Prince George's County Public Schools, 2014 WL 3345054, at *7 (D. Md. 2014) ("it would be a perverse reading of disability law to deny an employee a reasonable accommodation so that she cannot work, and then turn around and point to those absences as evidence that she is not qualified"); Chalmers v. Intel Corp., 2014 WL 358989, at *9 (D. Ariz. 2014); Peirano v. Momentive Specialty Chemicals, Inc., 2012 WL 4959429, at *10 (S.D. Ohio 2012) (rejecting employer's reliance on short-term disability leave as proof that plaintiff could not maintain attendance, because later attendance was satisfactory); Hodgetts v. City of Venice, Fla., 794 F. Supp. 2d 1265, 1275 (M.D. Fla. 2011) ("It cannot reasonably be argued that accommodations were being provided while allowing those accommodations to negatively impact Mr. Hodgetts's performance evaluations."); Myles v. University of Pennsylvania Health System, 2011 WL 6150638, *8 (E.D. Pa. 2011) (request that disability-related bathroom breaks not count against productivity was reasonable; "... there is a question of fact as to whether some of the time for which Plaintiff was disciplined--and which contributed to her termination--should have been classified as protected leave."); Waters v. Fred Meyer Stores, Inc., 2009 WL 1874271, at *9 (D. Or. 2009) (holding disability-related absences against plaintiff is evidence that resulting termination was because of disability); Franklin v. Consolidated Edison Co. of New York, Inc., 1999 WL 796170, *15 (S.D.N.Y. 1999) ("Plaintiff also claims that negative and sarcastic comments were made to her about her accommodation on many occasions, and that her accommodation was held against her in performance reviews. Accordingly, plaintiff's claim for retaliation under the ADA survives summary judgment.").

## IX.
## GARCIA'S ALLEGED FAILURED TO
## EXHAUST ADMINSTRATIVE REMEDIES

ICE construes Rick's EEOC complaint as a complaint relating to a "failure to accommodate claim." (Doc # 17, at 14.)  Rick has not brought a failure to accommodate claim, as Rick believes that ICE did accommodate him during his recovery time period.   Rick specially complains about termination and that is was not "fair to terminate [him] for sales that were down when [he] was not able to fully function on the job due to [his] disability."  (Exhibit 9, at ICE/GARCIA 000027 – 000028).   The authorities for this proposition are cited immediately above.

## X.
## LIABILITY AGAINST INDIVIDUAL DEFENDANTS

Rick argues that the individual Defendants are liable because ICE's corporate charter/certificate of is currently forfeited in the State of Texas for failure to pay its franchise tax. (Exhibit 11.)  The Texas Tax Code states "[i]f the corporate privileges of a corporation are forfeited for the failure to file a report or pay a tax or penalty, each director or officer of the corporation is liable for each debt of the corporation that is created or incurred in this state after the date on which the report, tax, or penalty is due and before the corporate privileges are revived . . . ." Tex. Tax Code Ann. § 171.255(a).   The individual Defendants, therefore, are liable for any "debt" "created or incurred" during the time ICE's corporate charter was forfeited.  Because the corporate charter is currently forfeited, the individual Defendants remain liable.

## XI.
## RELIEF

Rick requests a continuance of the deadline for him to respond to ICE's motion for summary judgment on the grounds that he has not had the opportunity to depose ICE's corporate representative, or the five listed witnesses ICE indicated on April 16, 2019 were likely to have discoverable knowledge (in response to interrogatory no. 2). (Exhibit 8.) On May 10, 2019, Rick conferred with Counsels for ICE about a motion for extension or continuance of the discovery deadline and Counsel indicated that they were opposed.

In support of this motion for continuance, Rick further attaches an affidavit as required under FRCP 56(d) which sets forth facts that are not available to Rick as the non-movant in this summary judgment context.    Said affidavit is attached and labeled as Exhibit 10.

Additionally, Rick requests clarification from the Court as to the management orders entered by the Court on April 9, 2019 (Doc # 16) and April 29, 2019 (Doc # 19) as to whether Rick has been ordered not to depose ICE's corporate representative, and the five listed witnesses ICE indicated on April 16, 2019 were likely to have discoverable knowledge.   (Exhibit 8.) The management orders, although titled "orders" do not contain any order language but merely indicate that Rick "may not" depose the requested individuals.   It is unclear to Rick whether this language indicated that Rick "may not" ever depose the requested individuals – in effect, whether this is a permanent ban on Rick from ever being able to depose these requested individuals or the Court merely ordered that Rick "may not" depose these individuals at or about the time that the issue was brought to the attention of the Court.[23] If the Court ordered the latter, then after the Court has had an opportunity to review Rick's response, the Court may have a better

---

[23] Additionally, the Court never indicated whether ICE's motion to quash filed on April 26, 2019 was ever "granted." (Doc # 18). As one of the three grounds for the motion, ICE indicated they had some sort of scheduling issue with the requested deposition date of May 3, 2019.   Now that that date has passed, Rick requests that the Court set a new date for the depositions.

understanding of Rick's case and believe that the case has merit in order to be able to conduct discovery on the requested individuals.

Additionally, ICE indicated that a number of discovery items "will be supplemented" in response to the Court's February 1, 2019 "order for disclosure." (Exhibit 6.) Rick previously conferred with ICE about these items of discovery, but no further response has been received from Rick on this issue and Rick therefore moves to compel ICE to produce the documents and information that ICE indicated would be supplemented. This refers to items B, C, E, H, I, and K. (Exhibit 6.)

Rick also requests that ICE produce a declaration or verification for the individual that answered interrogatories on April 16, 2019.  The April 16, 2019 interrogatories were unsworn.

Additionally, in light of the above, Rick requests that ICE's motion for summary judgment be denied.

Respectfully submitted,

**THE POERSCHKE LAW FIRM, PC**

/s/ R. Scott Poerschke, Jr.
R. SCOTT POERSCHKE, JR.
ATTORNEY-IN-CHARGE
SDTX No. 1134348
State Bar. No. 24067822
CHRIS J. AINSWORTH
SDTX No. 3006881
State Bar. No. 24072789
5111 Center Street
Houston, Texas 77007
Phone 713.974.1600
Fax 713.621.2106
scott@rsplegal.com

RESPONSE TO ICE'S MOTION FOR SUMMARY JUDGMENT

ainsworth@rsplegal.com

**ATTORNEY FOR PLAINTIFF**

<u>CERTIFICATE OF SERVICE</u>

I, R. Scott Poerschke, hereby certify that on May 10, 2019, a true and correct copy of the foregoing was served on the counsel of record below:

William R. Stukenberg
Wedge International Tower          *Via Email william.stukenberg@jacksonlewis.com*
1415 Louisiana, Suite 3325
Houston, Texas 77002

Mehronissa Modgil
JACKSON LEWIS P.C.                *Via Email Mehronissa.modgil@jacksonlewis.com*
500 N. Akard, Suite 2500
Dallas, Texas 75201

/s/ R. Scott Poerschke
R. SCOTT POERSCHKE